IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 9, 2020 Session

## STATE OF TENNESSEE v. KENZI EUGENE ANDERSON

**Appeal from the Criminal Court for Davidson County**
**No. 2019-A-29      Cheryl A. Blackburn, Judge**

_____

### No. M2020-00120-CCA-R3-CD

_____

A Davidson County jury found Defendant, Kenzi Eugene Anderson, guilty on two counts each of aggravated burglary, employing a firearm during the commission of a dangerous felony, and aggravated robbery, for which the trial court sentenced Defendant to an effective sentence of twenty-three years' incarceration. On appeal, Defendant contends that the trial court abused its discretion by denying Defendant's motion to sever defendants and by imposing an excessive sentence and that the trial court committed plain error by failing to sever his offenses for trial. Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, J.J., joined.

Manuel B. Russ (on appeal), and Carrie Searcy (at trial), Nashville, Tennessee, for the appellant, Kenzi Eugene Anderson.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Megan King, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural Background

*Motion for severance*

In case number 2019-A-29, Defendant was indicted for two counts of aggravated burglary, three counts of aggravated robbery, and two counts of employing a firearm during the commission of a dangerous felony. In the same indictment, a co-defendant, Donzell Malike Tyler, was charged with three counts of aggravated robbery and one count of aggravated sexual battery. Prior to trial, Defendant filed a motion for severance of defendants,[1] arguing that his trial should be severed from that of Co-Defendant Tyler to protect Defendant's "right to promote a fair determination of his guilt or innocence and avoid the danger of unfair prejudice, confusion of the issues, or misleading the jury." Defendant asserted that a severance was necessary pursuant to Tennessee Rule of Criminal Procedure 14(c)(2) because, at trial, evidence would be presented by the State against Co-Defendant Tyler regarding an aggravated sexual battery. He asserted that this evidence was inapplicable to Defendant and that, under Tennessee Rule of Evidence 403, the probative value of the evidence against Co-Defendant Tyler would be substantially outweighed by the danger of unfair prejudice to Defendant.

At a hearing on the motion for severance of defendants, defense counsel argued that the presentation of testimony regarding Co-Defendant Tyler's aggravated sexual battery charge "could potentially prejudice [Defendant]." Defense counsel acknowledged that the victim had not alleged that Defendant had a part in the sexual offense. However, counsel asserted that Defendant and Co-Defendant Tyler had "mutually antagonistic" defenses and that, if Co-Defendant Tyler chose to testify, he would implicate Defendant. Defense counsel explained that she believed Co-Defendant Tyler would testify that he "didn't do it, but [he] saw [Defendant] do all that" and that, in so testifying, Co-Defendant Tyler would be "acting as a second prosecutor, which is shifting that burden." Counsel for Co-Defendant Tyler opposed the motion for severance.

As proof, the parties provided the trial court with a recording and transcript of Defendant's preliminary hearing, as well as copies of the statements made to police by Defendant and Co-Defendant Tyler. The trial court took the matter under advisement and

---

[1] We note that the motion for severance of defendants was filed in case number 2018-A-44, before the date of the indictment in case number 2019-A-29. It appears from the record that the indictment in case number 2019-A-29 was a superseding indictment. Under the earlier indictment, Defendant and Co-Defendant Tyler were charged with crimes committed against the victims on the afternoon of November 23, 2015. At the time of the hearing on the motion to sever, the State was seeking a superseding indictment to include additional crimes committed earlier on November 23.

then issued a written order denying Defendant's motion for severance of defendants. The trial court first noted that, based on assurances by the State that it did not intend to introduce either defendants' statements to police, there was no problem under *Bruton v. United States*, 391 U.S. 123 (1968). Regarding Defendant's claim of mutually antagonist defenses, the trial court stated:

> The Court has reviewed [Co-Defendant] Tyler's police interview. In this interview, he admits he was present in the residence and describes [Defendant's] participation in the robbery. Although [Co-Defendant] Tyler casts blame for the robbery on [Defendant], [Defendant] has not established the compelling prejudice requirement. He has not demonstrated that the risk of a joint trial would compromise any rights or prevent the jury from making a reliable determination about guilt or innocence. Accordingly, [Defendant's] request to sever his trial from [Co-Defendant] Tyler is denied as to this ground.

As to Defendant's argument that a severance was necessary because evidence of the aggravated sexual battery charge against Co-Defendant Tyler would result in prejudice to Defendant, the trial court ruled:

> Considering the number of defendants (two), the number of counts (eight), the non-complex nature of the indictment, the estimated length of the trial, the non-disparate evidence against the defendants, the similar degrees of involvement by the defendant, the Court find[s] that [Defendant] will not be hampered in presenting his defense at a joint trial. [Defendant] has not met [his] burden of showing danger of unfair prejudice, confusion of the issues, or misleading the jury. Accordingly, [Defendant's] motion to sever is denied on this ground.

*Trial*

D.R.[2] testified that, in November 2015, she lived in a residence on Willow Creek Court in Davidson County with her boyfriend, Dante Scott, and her two young daughters. D.R. explained that, on November 23, she was at home asleep in her bed, while Mr. Scott was at work at UPS and her children were spending the night with their grandmother. D.R. said that she was awakened by her dog's growling around 3:00 a.m. When she got up, D.R. saw Defendant in her bedroom holding a gun.

---

[2] It is the policy of this court to refer to victims of sexual offenses by their initials only. No disrespect is intended.

D.R. testified that Defendant had been at her residence previously because he was a friend of Mr. Scott's and that she had seen Defendant four or five times prior to the morning of the offenses. D.R. said that Defendant put the gun "in her face" and demanded to know "where the stuff was, the money." D.R. said that another unknown individual was inside the residence with Defendant and that neither Defendant nor the other individual had permission to be in her home that morning. D.R. said that she did not know what Defendant was talking about and did not respond to his demand for money. Defendant then began rummaging through the bedroom closets and dresser drawers. D.R. recalled that the unknown individual was "walking around the house, looking in closets and other things." D.R. said that, before he left, Defendant took her wallet and the keys to a black 2015 Chevrolet Cruze that she and Mr. Scott rented from Hertz on November 21, 2015, to use on a trip to Chicago. She said that she realized her wallet and the rental car keys were missing around 7:30 that morning when she went to make sure her children got on the school bus. She said that she did not call the police immediately because Defendant threatened to shoot Mr. Scott at work if she called police. She tried to call Mr. Scott, but when he did not answer, she called a friend of Mr. Scott's, who was able to contact Mr. Scott for her.

D.R. testified that she saw Co-Defendant Tyler at her residence later that day around 1:30 or 2:00 p.m. She explained that she was walking to her mailbox when Co-Defendant Tyler drove by and said that he was going to the residence to talk to Mr. Scott. D.R. testified that Co-Defendant Tyler seemed nervous and "a little jittery" but that he was friends with Mr. Scott and had been at their residence previously.

Back inside the house, D.R. saw Mr. Scott and Co-Defendant Tyler talking in the kitchen. She testified that, as she began walking towards her bedroom, she heard the back door open and hit the dryer, causing a "loud boom." D.R. turned and saw Defendant inside the house with a gun. She explained that Defendant initially wore a mask but that he removed the mask, making it easy for her to identify him. D.R. heard Mr. Scott and the defendants talking loudly. Then, as she was in the hallway "peeping around the corner" into the kitchen, she saw Defendant shoot the gun into the floor. Mr. Scott ran out of the house after Defendant fired the gun. D.R. locked herself in her bedroom but realized that she could not call the police because her cell phone was in the living room. She said that she was leaning against the bedroom door when the defendants forced it open. D.R. recalled that Defendant and Co-Defendant Tyler, who also had a gun, began "pulling open drawers, taking shoes, pulling clothes out, [and] tried to take the TV off the wall." She said that they were looking for money. She recalled that Co-Defendant Tyler took "[s]ome Jordans" that belonged to Mr. Scott. Co-Defendant Tyler also touched D.R.'s breast and buttocks and told her that she needed "to get with a real man." D.R. testified that Co-Defendant Tyler did not have her consent to touch her. She said that, when the defendants left the residence, Defendant took the rental car from their driveway, and Co-Defendant

Tyler left in his own car. She stated that Defendant also took an X-box, some video games, food, and beer. She recalled that Co-Defendant Tyler said that he did not want to steal anything and that he wanted to leave. However, Defendant told Co-Defendant Tyler that he would shoot him if Co-Defendant Tyler did not take Mr. Scott's shoes. She said that the defendants were inside the residence for at least thirty minutes. After they left the scene, D.R. went to her mother's home, a few streets over. D.R. was "crying hysterically," and she and her mother called 911.

D.R. recalled that a detective came to her house later that night, and she identified Defendant and Co-Defendant Tyler in photographic lineups. She explained that, when she identified Defendant, she told the detective that Defendant "shot a hole in the floor" of the residence. She told the detective that Co-Defendant Tyler was the man who "fondled her." She identified a photograph of a hole in the floor of the kitchen of the residence. She also identified a photograph of damage to her bedroom door.

Dante Scott testified that he was at his residence on Willow Creek Court on the afternoon of November 23, 2015 between 1:30 and 2:00 p.m. when Co-Defendant Tyler came to his home. Mr. Scott explained that he had known Co-Defendant Tyler for five or six months and that they had worked together at UPS. He said that Co-Defendant Tyler and Defendant were friends and that he met Defendant through Co-Defendant Tyler. He stated that both men had previously visited him at his residence. Mr. Scott explained that Co-Defendant Tyler came to his home to talk about Defendant's breaking into the residence earlier that morning.

Mr. Scott testified that he first learned about the early morning break-in when he received a call from his work supervisor. Mr. Scott then called D.R., and she explained that Defendant had entered the residence with a gun. Mr. Scott stated that, to his knowledge, Defendant took some money and the keys to the rental car that morning. After learning about the early morning break-in, Mr. Scott called Co-Defendant Tyler, told him that Defendant broke into his residence early that morning, and asked if Co-Defendant Tyler knew Defendant's location. Mr. Scott "made certain threats towards [Defendant]" and told Co-Defendant Tyler that he was going to "put his hands on" Defendant and hurt him.

Mr. Scott said that, when Co-Defendant Tyler arrived at his home, they spoke in the kitchen. At one point, Mr. Scott went to use the restroom, and Co-Defendant Tyler opened the back door and "used the restroom . . . through the back door[.]" Mr. Scott said that Co-Defendant Tyler left the back door unlocked, and about ten minutes later, Defendant came through the back door wearing a mask and pointing a gun at Mr. Scott. Mr. Scott described the mask as a stocking cap with "[t]wo holes in the eyes and a hole in the mouth." Mr. Scott explained that Defendant eventually removed the mask. Defendant began "going

through [Mr. Scott's] drawers and . . . saying where is stuff at, where is the money." Defendant also asked Mr. Scott, "[W]hat is this . . . about you doing something to [me]?" Defendant then fired a bullet into the kitchen floor. Defendant asked Co-Defendant Tyler if he should "pop" Mr. Scott, and Co-Defendant Tyler indicated that he should. Mr. Scott testified that he told the defendants to take what they wanted and held up his hands. Defendant and Co-Defendant Tyler "started grabbing stuff out of [the] drawers and . . . opening [the] cabinets and . . . taking stuff out." Defendant continued to point the gun at Mr. Scott as Mr. Scott backed out of his kitchen and ran through the front door. Mr. Scott recalled that he banged on the door of the neighbor, but the neighbor was not home. He then called a co-worker who urged him to call police. Mr. Scott testified that he was not "fond" of the police and initially wanted to try to handle the situation without calling authorities.

Mr. Scott stated that he watched his residence from "a street over" and saw Defendant and Co-Defendant Tyler remove items from the residence. He stated, "They had popped the trunk of the rental car and put different items, chips, drinks, just all kind of different items in the car." He recalled seeing Defendant carrying a shoebox and a jewelry box out to the rental car. He stated that Co-Defendant Tyler left the residence in his own vehicle and that Defendant drove away in the rental car. Mr. Scott called D.R., and she and her mother picked him up in her mother's car.

Mr. Scott stated that, after reporting the incident to authorities, he identified Defendant and Co-Defendant Tyler as the perpetrators in photographic lineups. Mr. Scott explained that he had told Co-Defendant Tyler a few days prior that he was "getting some money from [his] granny" and that he had "different money coming in[.]" Regarding the items taken from the residence, Mr. Scott said that the defendants took "[s]ome Jordans," clothes, chips, drinks, beer, money, jewelry, an Xbox, the controllers, and several games. They attempted to remove a television from the wall but could not get it down. Mr. Scott testified that the stolen rental car was a black 2015 Chevrolet Cruze that he had rented from Hertz two days prior. He said that neither defendant had his permission to take the car or the items from the residence. Mr. Scott identified a photograph of a bullet hole in his kitchen floor and a shell casing found on the floor as coming from Defendant's gun. He said that he saw Defendant fire the gun into the floor.

On cross-examination, Mr. Scott stated that he immediately left work and went home after learning about the break-in. He said that, when he got home, the residence was "pretty much the same" but that he noticed "a drawer or two were open in the kitchen[.]" He then noticed that there was cash missing from the residence, which had been sitting on the kitchen table. Mr. Scott testified that he called Co-Defendant Tyler and made threats to shoot Defendant. Mr. Scott stated, however, that he did not own a gun and did not have one at his residence. Mr. Scott also called Defendant, but his call was not answered.

Officer Byron Dewalt of the Metro-Nashville Police Department (MNPD) testified that he responded to the victims' residence on Willow Creek Court on the afternoon of November 23, 2015. Mr. Scott and D.R. identified Defendant and Co-Defendant Tyler as the perpetrators of a home invasion. Officer Dewalt noticed a shell casing on the floor of the kitchen and a bullet hole in the floor. He said that the residence appeared to have "been gone through." Mr. Scott showed Officer Dewalt where items had been taken from the home. Officer Dewalt noticed that the television appeared to have been tampered with, "like somebody tried to get it, but they weren't able to." Based on the victims' allegations, Officer Dewalt called for detectives to come to the scene. He also contacted the rental car company and obtained information to enter the car into the National Crime Information Center, or NCIC, as stolen.

MNPD Officer Ryan Matson testified that he worked in the department's crime scene investigation unit in November 2015. Officer Matson recalled that he responded to the victims' residence at 4:25 p.m. on November 23. Officer Matson spoke to Detective Garrett Kidd to get an overview of the crime scene, and then he photographed the scene and collected a Winchester .40 caliber cartridge casing from the kitchen floor. He also lifted four fingerprints on a flatscreen television in a back bedroom. Officer Matson stated that he later submitted the fingerprints to a latent fingerprint examiner for review. He agreed that the victims were inside the residence and that they showed him items that the perpetrators touched.

Bridget Chambers testified that she was a forensic scientist who worked in the MNPD crime laboratory in the firearms identification unit. Ms. Chambers identified a Glock 27 .40 caliber semiautomatic pistol that was submitted as evidence in the case. She explained that the pistol was test-fired by another technician and that she compared the cartridge cases from the test-fired weapon to the .40 caliber cartridge casing collected by Officer Matson at the victims' residence. Based on her comparison under a microscope, Ms. Chambers stated that the .40 caliber cartridge casing collected by Officer Matson had been fired through the Glock 27 pistol.

Sergeant Robert Fohrd testified that he was employed with the Hendersonville Police Department on the morning of November 24, 2015, when he went to a residence on Marine Drive in Hendersonville. Sergeant Fohrd explained that he went to the residence based on information provided by detectives in Nashville about the stolen rental car. When he arrived at the residence, Sergeant Fohrd observed the stolen rental car in the driveway with its reverse lights on. He notified dispatch that he located the vehicle, exited his patrol car, and "took a position of cover" at the residence next door. He saw Defendant walk away from the stolen rental car towards the front door of the residence. Sergeant Fohrd then approached Defendant and gave commands to show his hands and get on the ground. As backup officers arrived, Sergeant Fohrd took Defendant into custody. Sergeant Fohrd

said that Defendant matched the suspect description provided by detectives in Nashville. During a search of the stolen rental car, Sergeant Fohrd found a handgun lying on the front seat. He said that detectives from Nashville arrived and took over the investigation.

Detective Garrett Kidd testified that he worked in the criminal investigations division of the MNPD on November 23, 2015, when he responded to the crime scene on Willow Creek Court. He stated that the victims were "extremely upset" and "distraught" but cooperative with the investigation. The victims identified the perpetrators, Defendant and Co-Defendant Tyler, by name. Detective Kidd then created two photographic lineups for the victims to view. When shown the first lineup, D.R. immediately identified Defendant and said, "[H]e shot a hole in my floor and took a bunch of stuff from my room." D.R. identified Co-Defendant Tyler in the second photographic lineup and got "very emotional" when doing so. Detective Kidd then showed the lineups to Mr. Scott, who identified Defendant in the first lineup and stated, "He's the one who robbed me." When he identified Co-Defendant Tyler in the second photographic lineup, Mr. Scott stated, "[He] [s]et me up to be robbed and took my rental car." Based on the victims' identifications, Detective Kidd took out arrest warrants for the defendants.

Detective Kidd testified that he learned through his investigation that Defendant and Co-Defendant Tyler both lived in Hendersonville, so he contacted Hendersonville police and asked that they search the areas where the defendants lived. Detective Kidd explained that the stolen rental car was located on Marine Drive in Hendersonville on November 24. Detective Kidd responded to Marine Drive minutes after Hendersonville police took Defendant into custody. During a search of the stolen rental car, a Glock handgun was found in the driver's seat. Detective Kidd said that they also collected numerous video games from the stolen rental car. When Defendant was searched after his arrest, officers located a large amount of cash in Defendant's possession. Detective Kidd explained that Co-Defendant Tyler later turned himself in but that no stolen items were found in his possession.

Jacqueline Cockrill testified that she was a forensic scientist employed in the MNPD's crime lab in the latent print unit. Ms. Cockrill stated that she was asked to process four latent prints collected from the flat screen television mounted on the wall of the victims' residence. Ms. Cockrill said that one of the latent prints recovered from the crime scene matched Defendant's known prints, which she obtained from the Automated Fingerprint Identification System or AFIS. Ms. Cockrill concluded that the fingerprint matched Defendant's print, and her findings were verified by a second latent print examiner. Ms. Cockrill explained that two of the latent prints were of no evidentiary value and that the remaining print belonged to Mr. Scott.

No proof was offered on behalf of Defendant or Co-Defendant Tyler. Following deliberations, the jury found Defendant guilty of aggravated burglary in Count 1; employing a firearm during the commission of a dangerous felony in Count 2; aggravated robbery in Count 3; aggravated robbery in Count 4; aggravated burglary in Count 6; and employing a firearm during the commission of a dangerous felony in Count 7. The jury found Defendant not guilty of aggravated robbery in Count 5.[3]

*Sentencing*

At a subsequent sentencing hearing, the State presented Defendant's presentence report, and Defendant offered into evidence certain medical records. In reviewing the presentence report, the trial court noted that Defendant had one prior felony conviction for aggravated robbery. The presentence report indicated that Defendant was cited for violating probation on December 16, 2010, on a theft conviction. However, the disposition of the violation could not be verified by the report writer. The presentence report also reflected that Defendant used the victims' stolen rental car the following day in a third home invasion robbery. The trial court noted that the Needs Assessment portion of the presentence report was inaccurate because it did not recognize that Defendant was already serving a sentence, and therefore, the court stated that it would not rely on the Needs Assessment.

Kelly Anderson testified that Defendant was her oldest son. She said that he was "born into the home where there was domestic violence." Ms. Anderson explained that Defendant began taking Adderall or Ritalin when he was three years old but that the medication caused seizures and that he was taken off the medication. She said that Defendant was placed back on medication when he was in elementary school because he "couldn't function like other children." Ms. Anderson said that Defendant was in counseling up until the time he graduated high school. She said that Defendant "worked off and on" but "[n]ot very long anywhere." She said that he was fired from "a lot of jobs."

Ms. Anderson said that, prior to the instant offenses, Defendant "kept coming home messed up" and she believed that he was using illegal drugs. She said that he "got really bad . . . about a month before he got in trouble[.]" She stated that Defendant lived at home with her and that he helped care for his two younger siblings. Ms. Anderson stated that Defendant had been incarcerated for three and a half years and that he was now clean "for the first time in his life[.]" She said that Defendant was high when he was arrested and that he "had been up for four or five days[.]" Ms. Anderson testified that Defendant was a

---

[3] The jury found Co-Defendant Tyler not guilty of the aggravated robbery of D.R. and not guilty of the aggravated robbery of Mr. Scott; however, it was hung on the lesser-included offenses for that charge as to Mr. Scott. The jury found Co-Defendant Tyler not guilty of aggravated sexual battery and were hung on the lesser-included offenses for the charge.

giving person and was not violent. She explained that Defendant had a "great support system" for when he was released from incarceration.

Ms. Anderson said that Defendant "smoked pot" and that, when he was arrested, he was "on Molly, and pain pills, and Xanaxs, and a lot of alcohol." She acknowledged that Defendant had a record as a juvenile. She said that he was arrested for burglary at the age of sixteen or seventeen and that he was placed on probation in juvenile court. She recalled that Defendant also had a conviction as an adult for contributing to the delinquency of a minor.

Kasen Anderson, Defendant's brother, testified that Defendant helped care for him when their mother was at work. He said that Defendant attended his basketball and football games. He said that Defendant was "a great person if you get to know him" and that Defendant has continued to encourage him in his school and sports.

Defendant made a statement of allocution in which he apologized for "the damage that [he] caused" and said that he took responsibility for the offenses.

At the conclusion of the sentencing hearing, the trial court stated:

Well, let's go over what -- the purposes of the 2005 sentencing act, the purposes are laid out in [Tennessee Code Annotated section] 40-35-102, in that (as read): "A defendant should be punished by the imposition of a sentence justly deserved in relationship to the seriousness of the offense and to ensure fair and consistent treatment of all defendants by eliminating any unjust disparity across the State; imposed to prevent crime and provide respect for the law; and, in recognition that State prison capacities are limited, that convicted persons in the Department of Correction should be those of the most severe offenses possessing criminal history indicating disregard for laws and morals of society."

And [Defendant is] not eligible for an alternative sentence, so the other issues that normally the Court looks at are not available to [Defendant].

So, the matters to be considered are listed at [Tennessee Code Annotated section] 40-35-210(b). And that would be the evidence at trial; and, the sentencing hearing; the presentence report.

. . . .

- 10 -

The principles of sentencing and arguments as to all the factors, again, there is no alternative here. (As read): "The nature and characteristics of the criminal conduct; any enhancing and mitigating factors" -- and I'll go over those here in a second. And, then statistical information that the Administrative Office of the Courts provides to the courts, with regard to sentencing practices across the state, so that there is some sort of consistency across the state; and, defendant's statement.

Now, he was not under oath when he made an allocution, and the Court will consider that.

All right. So, looking at the enhancing factors: Factor number one is made out by the proof, now it's not a very -- he doesn't have much of a prior record; but, he does have some. So, that factor does apply. Now, factor number two, which is that he was a leader in the commission of an offense involving two or more actors, would be limited to the afternoon, which would be Counts [4], [6], and [7] . . . . That is because of [Co-Defendant] Tyler letting him in and all the facts and circumstances we heard at the trial.

It would not apply to the first counts because he was a single, sole, actor at that point. That before trial he failed to comply with conditions of sentencing, release in the community, I think the State has proven that.

The possession of a firearm would only apply to the aggravated burglaries. We do have an enhancing factor that goes along with that, so though it is there I am not going to use it all.

Looking at the other factors, there is some indication from his reports that he had some prior juvenile one, but I don't have any good proof of that. So, I am not going to use factor number sixteen, at all.

. . . .

Looking at the mitigating factors: The defense has relied on factor six, that because of his youth that judgment -- about his mental condition, probably. That he assisted the authorities; I don't think I have very much proof of that. And, then, any other factor consistent with the purpose of the chapter.

[Defendant] wasn't that young, and I don't find that that factor is there; or, that his mental condition, really, reduced his culpability. Looking

at those, I am just not going to give them any weight. He did apologize. Again, very little weight with regard to that.

Based on these considerations, the trial court sentenced Defendant, as a Range I standard offender, to five years for aggravated burglary in Count 1; six years for employing a firearm during the commission of a dangerous felony in Count 2; ten years for aggravated robbery in Count 3; ten years for aggravated robbery in Count 4; six years for aggravated burglary in Count 6; and six years for employing a firearm during the commission of a dangerous felony in Count 7.

As to consecutive sentencing, the trial court first noted that the sentences for employing a firearm during the commission of a dangerous felony were required to be served consecutively to the sentences for the underlying dangerous felony. In this case, the underlying dangerous felony was aggravated burglary as charged in Counts 1 and 6. Accordingly, the trial court ordered the sentence in Count 2 to run consecutively to Count 1 and the sentence in Count 7 to run consecutively to Count 6.

Regarding discretionary consecutive sentencing the trial court stated:

> The State relies on the only possible grounds for doing this; and, that is he is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. And, clearly, when you go into somebody's house in the middle of the night, with a weapon; and, then, the second phase of this, there was an actual shot fired. And so you have the first set of offenses and then there's a -- coming back into that location, all of them being mad about something, that there is -- he is a dangerous offender.

> Now, I can't just automatically find that they're all consecutive. I have to determine whether the aggregate time reasonabl[y] relates to the severity of the offenses and it is necessary in order to protect the public from further serious criminal conduct by the defendant.

> So, what we have here, in a total, probably, twenty-four to forty-eight hours, we have a breaking into a home; committing aggravated robberies and stealing; coming back to that home and using a gun, firing it off.

> The car is taken. And then you end up at another location later that day, where he's arrested, and it is another aggravated robbery. So, we have three separate sets of sentences, that is somebody who needs to be protected from the public. There is -- it just didn't stop one time, or stop a second time,

there was at third time. And that is -- relates to the severity of the offenses, and that it is necessary to protect the public from further serious conduct.

Based on these considerations, the trial court imposed consecutive sentences, for a total effective sentence of twenty-three years, as follows:

| Count | Offense | Time | Sentence | Alignment |
|-------|---------|------|----------|-----------|
| 1 | Aggravated burglary | Morning offense | 5 yrs. | |
| 2 | Employing a firearm during the commission of a dangerous felony | Morning offense | 6 yrs. | Consecutive to Count 1 |
| 3 | Aggravated robbery | Morning offense | 10 yrs. | Concurrent with the effective 11-year sentence in Counts 1 and 2 |
| 4 | Aggravated robbery | Afternoon offense | 10 yrs. | Concurrent with the effective 12-year sentence in Counts 6 and 7 |
| 6 | Aggravated burglary | Afternoon offense | 6 yrs. | Consecutive to Counts 1-3 |
| 7 | Employing a firearm during the commission of a dangerous felony | Afternoon offense | 6 yrs. | Consecutive to Count 6, Consecutive to Counts 1-3 |

The trial court also ordered that Defendant's sentence in this case to run consecutively to his sentence in case number 2017-A-160.[4]

Defendant filed a timely motion for new trial, which the trial court denied in a written order after a hearing. This timely appeal follows.

---

[4] It appears from the record that Defendant was charged with multiple offenses in case number 2017-A-160, all relating to the robbery of a victim on Standing Stone Court on November 24, 2015. Defendant entered a guilty plea in that case on October 12, 2017.

## II. Analysis

### A. Severance of defendants

Defendant contends that the trial court abused its discretion by denying his motion for severance of defendants. He asserts that he was "clearly prejudiced" by the testimony that Co-Defendant Tyler sexually assaulted D.R., arguing that this evidence "changed the tone of the trial" and created a negative perception of him based on Co-Defendant Tyler's conduct. The State responds that the trial court did not abuse its discretion in denying the motion to sever Defendant's case from Co-Defendant Tyler's.

The United States Supreme Court has previously recognized that "[j]oint trials play a vital role in the criminal justice system[.]" *Richardson v. Marsh*, 481 U.S. 200, 209 (1987). Joint trials promote judicial efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Id.* at 210. Tennessee Rule of Criminal Procedure 8(c)(3) provides:

> (c) Joinder of Defendants. An indictment, presentment, or information may charge two or more defendants:
>
> . . . .
>
> (3) even if conspiracy is not charged and all of the defendants are not charged in each count, if the several offenses charged:
>
> > (A) were part of a common scheme or plan; or
> >
> > (B) were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others.

Tenn. R. Crim. P. 8(c)(3). The rule of joinder promotes judicial economy and efficiency by encouraging a single trial for offenses arising out of a single criminal episode. Tenn. R. Crim. P. 8, Advisory Comm. Cmts.

However, Tennessee Rule of Criminal Procedure 14 provides that a trial court shall grant a severance of defendants before trial if "the court finds a severance necessary to protect a defendant's right to a speedy trial or appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(A). Our supreme court has explained:

There is no bright-line rule as to when a trial court should grant a defendant's request for severance. Courts consider the following factors, none of which are dispositive, when deciding whether to grant a severance: the number of defendants named in the indictment, the number of counts charged in the indictment, the complexity of the indictment, the estimated length of the trial, the disparities in the evidence offered against the defendants, the disparities in the degrees of involvement by the defendants in the charged offenses, possible conflicts between the defendants and their strategies, and prejudice from evidence admitted against a co-defendant(s) which is inadmissible or excluded as to another defendant.

When two or more defendants are charged in the same indictment, evidence that is not necessarily applicable to another defendant may be admissible against one or more defendants. A defendant is not entitled to a separate trial merely because damaging proof is introduced against another defendant.

*State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018) (internal citations omitted). Furthermore,

[w]hile "mutually antagonistic" defenses may mandate severance in some circumstances, they are not prejudicial per se. Due to the difficulty in establishing prejudice, relatively few convictions have been reversed for failure to sever on these grounds. Mere attempts to cast the blame on the other will not, standing alone, justify a severance on the grounds that the respective defenses are antagonistic. The defendant must go further and establish that a joint trial will result in compelling prejudice, against which the trial court cannot protect, so that a fair trial cannot be had.

*State v. Ensley*, 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996) (internal citations omitted).

The decision to grant or deny a motion for severance of defendants rests within the sound discretion of the trial court, and we will not disturb the trial court's ruling absent clear abuse of that discretion. *State v. Dotson*, 254 S.W.3d 378, 390 (Tenn. 2008). "Where a motion for severance has been denied, the test to be applied in determining whether the trial court abused its discretion is whether the defendant was 'clearly prejudiced' in his defense as a result of being tried with his codefendant[.]" *State v. Price*, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000). The record must demonstrate that "the granting of a severance became a judicial duty" before an accused is entitled to a reversal of his conviction. *State v. Burton*, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988) (quoting

*Hunter v. State*, 440 S.W.2d 1, 6 (Tenn. 1969), *vacated on other grounds by Hunter v. Tennessee*, 403 U.S. 711, 712 (1971)).

In this case, the trial court did not abuse its discretion in denying Defendant's motion for severance of defendants. In considering the request for severance prior to trial, the trial court based its decision on the proper legal standard and factors in *Harbison* and determined that a severance of defendants was not required to promote a fair determination of the guilt or innocence of Defendant. Other than a blanket assertion by Defendant that D.R.'s testimony that she was sexually assaulted by Co-Defendant Tyler "changed the tone of the trial" and created a negative perception of him, Defendant has not demonstrated on appeal how he was prejudiced by this testimony. D.R. clearly testified that it was Co-Defendant Tyler who sexually assaulted her. In any event, the prejudice of this aspect of D.R.'s testimony was minimal as the jury was unable to reach a decision on Co-Defendant Tyler's aggravated sexual battery charge.

We note that the evidence against Defendant as to his role in the offenses was strong. Mr. Scott and D.R. consistently identified Defendant and described his role in the offenses. Both victims knew Defendant and easily recognized him. They testified that Defendant fired his gun into the kitchen floor and drove away in their rental car. Defendant was apprehended in the stolen rental car, and the cartridge casing found on their kitchen floor was discharged from the gun found in the stolen rental car at the time of Defendant's arrest. Investigators also matched Defendant's fingerprint to a latent print lifted from the victims' television, which Mr. Scott said the defendants attempted to remove from the wall. In its charge to the jury, the trial court instructed that jurors "should give separate consideration to each defendant" and that "[a]ny evidence which was limited to a particular defendant should not be considered . . . as to any other defendant." The jury is presumed to have followed the instructions given by the trial court. *State v. Reid*, 164 S.W.3d 286, 323 (Tenn. 2005).

Defendant was not "clearly prejudiced" in his defense as a result of being tried with Co-Defendant Tyler. *See Price*, 46 S.W.3d at 803. Accordingly, the trial court did not abuse its discretion in denying the motion for severance of defendants, and Defendant is not entitled to relief on this claim.

### B. Severance of offenses

Defendant contends that the trial court committed plain error by failing to sever the offenses in Counts 1-3, concerning Defendant's actions in the early morning of November 23, from the remaining counts of the indictment. Defendant argues that the State combined the charges against him in the same indictment based on permissive joinder under Tennessee Rule of Criminal Procedure 8(b) and that, despite his failure to request a

severance of offenses, the trial court should have severed the offenses *sua sponte* because they were not part of a common scheme or plan and because evidence of one would not be admissible in a trial of the other. The State responds that Defendant is not entitled to plain error review of his claim that his offenses should have been severed.

In his brief, Defendant acknowledges that he failed to raise this issue in the trial court. As such, he waived this court's consideration of the issue. *See* Tenn. R. Crim. P. 12(f); *Spicer v. State*, 12 S.W.3d 438, 443 (Tenn. 2000). Although Defendant has waived the issue, this court may notice an error as plain error under Rule 36(b) if the error affected the substantial rights of an accused and if notice of the error is necessary to do substantial justice. Tenn. R. App. P. 36(b). Plain error has been characterized as error that is obvious or egregious and has been "limited to those [errors] so objectionable that they should have been apparent to the trial judge or that strike at the fundamental fairness, honesty or public reputation of the trial." *United States v. Rodriguez*, 882 F.2d 1059, 1064 (6th Cir. 1989).

In *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994), this court listed five factors to be applied to determine when alleged trial error constitutes "plain error":

> 1) the record must clearly establish what occurred at trial; 2) a clear and unequivocal rule of law must have been breached; 3) a substantial right of the accused must have been adversely affected; 4) the accused did not waive the issue for tactical reasons; and 5) consideration of the error is "necessary to do substantial justice."

*Id.* at 641-42. In *State v. Smith*, 24 S.W.3d 274 (Tenn. 2000), our supreme court "formally" adopted this analysis, stating that "the *Adkisson* test provides a clear and meaningful standard for considering whether a trial error rises to the level of plain error in the absence of an objection." *Smith*, 24 S.W.3d at 282-83. In applying the *Adkisson* test, the *Smith* court stated:

> We re-emphasize that the presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. In addition, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial."

*Smith*, 24 S.W.3d at 283 (quoting *Adkisson*, 899 S.W.2d at 642). In *State v. Thomas*, 158 S.W.3d 361 (Tenn. 2005), our supreme court stated that, ultimately, a trial error must have had "an unfair prejudicial impact which undermined the fundamental fairness of the trial." *Thomas*, 158 S.W.3d at 413 (citing *Adkisson*, 899 S.W.2d at 642).

Rule 8(b) of the Tennessee Rules of Criminal Procedure provides that "[t]wo or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13, if: (1) the offenses constitute parts of a common scheme or plan; or (2) they are of the same or similar character." Tenn. R. Crim. P. 8(b). Conversely, Rule 14 provides that "[i]f two or more offenses are joined or consolidated for trial pursuant to Rule 8(b), the defendant has the right to severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1).

Our supreme court has stated that, when reviewing the severance of offenses on appeal, the "primary inquiry into whether a severance should have been granted under Rule 14 is whether the evidence of one crime would be admissible in the trial of the other if the two counts of indictment had been severed." *State v. Burchfield*, 664 S.W.2d 284, 286 (Tenn. 1984). To protect a defendant's right to a fair trial, Tennessee Rule of Evidence 404(b) excludes "[e]vidence of other crimes, wrongs, or acts" committed by a defendant when the evidence is offered only to show the defendant's propensity to commit those "crimes, wrongs, or acts." Tenn. R. Evid. 404(b). However, evidence of other "crimes, wrongs, or acts" may be admissible for other purposes, such as motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, or a common scheme or plan for the commission of two or more crimes so related to each other that proof of one tends to establish the other. *Id.*, Adv. Comm'n Cmts.; *State v. Hoyt*, 928 S.W.2d 935, 944 (Tenn. Crim. App. 1995), *overruled on other grounds by Spicer*, 12 S.W.3d at 447 n.12.

Tennessee courts recognize three types of common scheme or plan evidence: (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction. *State v. Shirley*, 6 S.W.3d 243, 248 (Tenn. 1999); *State v. Moore*, 6 S.W.3d 235, 240 (Tenn. 1999). A larger, continuing plan or conspiracy "involves not the similarity between the crimes, but [rather] the common goal or purpose at which they are directed." *State v. Denton*, 149 S.W.3d 1, 15 (Tenn. 2004) (quoting *Hoyt*, 928 S.W.2d at 943). In other words, crimes that are part of a larger plan or conspiracy must be committed "in furtherance of a plan that had a readily distinguishable goal, not simply a string of offenses." *Id.* The Tennessee Supreme Court explained that "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." *Moore*, 6 S.W.3d at 240 n.7.

Here, the joinder of Counts 1-3 with the remaining counts of the indictment was proper because the evidence of both sets of crimes demonstrated a larger, continuing plan or conspiracy between Defendant and Co-Defendant Tyler to take the money that Mr. Scott had told Co-Defendant Tyler that he received from his grandmother. The evidence showed

that Defendant was after the money both times that he broke into the victims' residence. Additionally, evidence of the offenses committed by Defendant in the early morning of November 23 (Counts 1-3) would have been admissible in a trial of the remaining counts. The evidence would explain why Mr. Scott threatened Defendant and why Defendant confronted Mr. Scott about those threats when he returned to the victims' residence that afternoon. *See State v. Gilliland*, 22 S.W.3d 266, 272 (Tenn. 2000). There are also multiple factual similarities between the two sets of offenses. Defendant broke into the same residence on the same day, demanding that the victims give him "the money." Defendant was armed with a gun both times, and he returned in the afternoon with Co-Defendant Tyler because he had been unable to locate the money that morning. Defendant has not established a breach of a clear and unequivocal rule of law, and he is not entitled to plain error relief.

## C. Sentencing

Defendant asserts that the trial court abused its discretion by enhancing Defendant's sentences within his range of punishment and by imposing consecutive sentencing. The State responds that the trial court's sentencing determinations are presumptively reasonable and that Defendant has not established that the trial court abused its discretion.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210 (2019); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2019).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2019); *Bise*, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2019), Sentencing Comm'n Cmts.

Here, the trial court considered the factors set out in section 40-35-210 and stated on the record the reasons for Defendant's sentences. Thus, the trial court's sentencing decisions are entitled to a presumption of reasonableness, and we will not reverse absent an abuse of discretion.

## 1. Sentence length

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2019).

Although the trial court should also consider enhancement and mitigating factors, such factors are advisory only. *See* Tenn. Code Ann. § 40-35-114 (2019); *see also Bise*, 380 S.W.3d at 698 n. 33, 704; *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *Carter*, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" *Id.* at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a

manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Carter*, 254 S.W.3d at 346.

In this case, the sentences imposed by the trial court were within the applicable range of punishment for each conviction. The range of punishment for a Range I standard offender convicted of aggravated burglary, a Class C felony, is three to six years (Counts 1 and 6); for employing a firearm during the commission of a dangerous felony, a Class C felony, a mandatory six-year sentence (Counts 2 and 7); and for aggravated robbery, a Class B felony, is eight to twelve years (Counts 3 and 4). *See* Tenn. Code Ann. §§ 40-35-112(a)(2)-(3); 39-17-1324(b)(1), (h)(1); 39-13-403(b); 39-13-402(b) (2019).

In setting the sentence length for each conviction, the trial court found that several enhancing factors applied to Defendant. Specifically, the court found that Defendant had "a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range;" that Defendant was "a leader in the commission of an offense involving two (2) or more criminal actors;" and that "before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[.]" Tenn. Code Ann. § 40-35-114(1)-(2), (8) (2019). As to mitigating factors, the trial court noted that Defendant apologized for his actions but gave that factor "very little weight[.]" *See* Tenn. Code Ann. § 40-35-113(13) (2019).

The record supports the trial court's application of enhancement factors. The presentence report established that Defendant had prior convictions for aggravated robbery and disorderly conduct. Moreover, Defendant presented evidence of prior criminal behavior at the sentencing hearing. Ms. Anderson testified about Defendant's past illegal drug use, stating that Defendant "smoked pot" and that, when he was arrested, he was "on Molly, and pain pills, and Xanaxs, and a lot of alcohol." The evidence also supports the trial court's finding that Defendant was a leader in the commission of the crimes. Defendant entered the victims' residence through a door left unlocked by Co-Defendant Tyler. Defendant was armed with a gun and pointed it at Mr. Scott. He demanded to know where Mr. Scott kept his money. He fired a shot into the kitchen floor and threatened to shoot Mr. Scott. Defendant also threatened to shoot Co-Defendant Tyler if he did not take "some Jordans" belonging to Mr. Scott. The defendants carried out the victims' belongings and put them into the trunk of the rental car. Defendant had previously stolen the keys to the rental car, and he drove away from the scene in the vehicle. The trial court properly considered enhancement factor (2).

Defendant contends that the proof does not show that he previously violated probation. *See* Tenn. Code Ann. § 40-35-114(8). The presentence report indicates that Defendant was cited for violating probation on December 16, 2010, on a theft conviction. It is not clear from the record, however, if Defendant was found to have violated his

probation, and no additional proof was presented regarding this issue. We conclude that, even if the trial court misapplied enhancement factor (8), the evidence supports the court's application of enhancement factors (1) and (2), and thus, the within-range sentence imposed should be upheld. *See Bise*, 380 S.W.3d at 706 (concluding that if there are "other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.") Defendant is not entitled to relief on this issue.

## 2. Consecutive sentencing

In *State v. Pollard*, the Tennessee Supreme Court expanded its holding in *Bise* to trial courts' decisions regarding consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* (citing Tenn. R. Crim. P. 32(c)(1)).

### a. Mandatory consecutive sentences

By operation of law, a sentence for employing a firearm during the commission of a dangerous felony "shall be served consecutive to any other sentence the person is serving at the time of the offense or is sentenced to serve for conviction of the underlying dangerous felony." Tenn. Code Ann. § 39-17-1324(e)(1) (2019). In the present case, the underlying dangerous felony was aggravated burglary as charged in Counts 1 and 6, *see* Tenn. Code Ann. § 39-17-1324(i)(1)(H) (2019), and therefore, the trial court properly ordered the six-year sentences for employing a firearm during the commission of a dangerous felony in Count 2 and 7 to run consecutively to the sentences for aggravated burglary in Counts 1 and 6, respectively. Defendant argues that, although aggravated burglary is enumerated under section 39-17-1324(i)(1)(H) as an underlying offense to trigger the statute, the offense "does not, by definition, involve dangerous behavior and cannot be deemed a dangerous felony by the General Assembly without some causal connection between the offense conduct and the enhancement." As noted by the State, however, a plain reading of the statute indicates that the legislature fully intended to include aggravated burglary as a dangerous felony. Moreover, "it is not for the courts to alter or amend a statute, question the statute's reasonableness, or 'substitut[e] [our] own policy judgments for those of the legislature.'" *State v. Owens*, 20 S.W.3d 634, 640 (Tenn. 2000) (quoting *BellSouth Telecomms., Inc. v. Greer*, 972 S.W.2d 663, 673 (Tenn. Ct. App. 1997)). The trial court properly imposed mandatory consecutive sentences.

*b. Discretionary consecutive sentences*

Section 40-35-115 states that a trial court may impose discretionary consecutive sentencing when "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]" Tenn. Code Ann. § 40-35-115(b)(4) (2019); *see State v. Wilkerson*, 905 S.W.2d 933, 936 (Tenn. 1995). Before a trial court may impose consecutive sentences on the basis that a defendant is a dangerous offender the trial court must also find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939. In order to limit the use of the "dangerous offender" category to cases where it is warranted, our supreme court has stated that the trial court must make specific findings about "particular facts" which show that the *Wilkerson* factors apply to the defendant. *State v. Lane*, 3 S.W.3d 456, 461 (Tenn. 1999).

Here, the trial court found that Defendant was a dangerous offender "whose behavior indicate[d] little or no regard for human life and no hesitation about committing a crime in which the risk to human life [was] high." Tenn. Code Ann. § 40-35-115(b)(4). The trial court also addressed the *Wilkerson* factors and found that "the aggregate time reasonable relate[d] to the severity of the offenses and it [was] necessary in order to protect the public from further serious criminal conduct by the defendant" and that Defendant's behavior necessitated an extended sentence. *Wilkerson*, 905 S.W.2d at 939. The court explained:

> And, clearly, when you go into somebody's house in the middle of the night, with a weapon; and, then, the second phase of this, there was an actual shot fired. And so you have the first set of offenses and then there's a -- coming back into that location, all of them being mad about something, that there is -- he is a dangerous offender.
>
> . . . .
>
> So, what we have here, in a total, probably, twenty-four to forty-eight hours, we have a breaking into a home; committing aggravated robberies and stealing; coming back to that home and using a gun, firing it off.
>
> The car is taken. And then you end up at another location later that day, where he's arrested, and it is another aggravated robbery. So, we have three separate sets of sentences, that is somebody who needs to be protected from the public. There is -- it just didn't stop one time, or stop a second time,

- 23 -

there was at third time.  And that is -- relates to the severity of the offenses, and that it is necessary to protect the public from further serious conduct.

The record supports the trial court's findings.  Defendant unlawfully entered the victims' residence in the middle of the night and again later the same day and demanded money while armed with a loaded gun.  Although Defendant was aware that Mr. Scott had made threats to shoot him for the earlier break-in, Defendant returned to the residence that afternoon, barged in through the back door, confronted Mr. Scott about his threats, and fired a bullet into the victims' kitchen floor.  Defendant pointed the gun at Mr. Scott and threatened to shoot Mr. Scott if he did not comply with his demands.  Additionally, the presentence report reflects that Defendant used the victims' stolen rental car the following day in a third home invasion robbery.

The trial court supported its conclusions and did not merely recite the *Wilkerson* factors.  *See State v. Prentice C. Calloway*, No. M2004-01118-CCA-R3-CD, 2005 WL 1307800, at *13 (Tenn. Crim. App. June 2, 2005).  Defendant has not established that the trial court abused its discretion by the imposition of consecutive sentences, and he is not entitled to relief on this issue.

### III. Conclusion

Based on the foregoing, the judgments of the trial court are affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 24 -